**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------X
WELLS FARGO BANK, N.A.,

              Plaintiff,

    -against-

NATIONAL GASOLINE, INC., CHAIM
LAX, DAVID RISHTY, 86 GAS CORP.,
BAISLEY GAS CORP., MELROSE GAS
CORP., 111th STREET GAS CORP.,
NEPTUNE OIL CORP., 100
ROCKAWAY GAS CORP., COOPER
GAS CORP., 2061 GAS CORP., 8521
GAS CORP., FOREST GAS CORP.,
MAIRA RISHTY, SHLOMO ARJE a/k/a
MICHAEL ARJE, NATIONAL
GASOLINE WHOLESALE, LLC, 971
GAS CORP., SUN FUEL CORP., 2509
GAS CORP., IRVINGTON OIL CORP.,
FLATBUSH OIL CORP., LEAHS
EQUITIES, INC., WRIGHTSTOWN GAS
CORP., CATON GAS CORP., SUPERIOR
GAS CORP., 31ST GAS CORP., DOE,
INC. 1 through 10, and JOHN and/or JANE
DOES 1 through 10,

              Defendants.

-----------------------------------------------------X

**FINDINGS OF FACT &**
**<u>CONCLUSIONS OF LAW</u>**

10-CV-1762 (RER)

**RAMON E. REYES, JR., U.S.M.J.:**

      Wells Fargo Bank, N.A., ("Plaintiff"), commenced this diversity action against

defendants National Gasoline, Inc. ("National Gasoline" or "National"), Chaim Lax ("Lax"),

David Rishty ("Rishty"), 86 Gas Corp., Baisley Gas Corp., Melrose Gas Corp., 111th Street Gas

Corp., Neptune Oil Corp., 100 Rockaway Gas Corp., Cooper Gas Corp., 2061 Gas Corp., 8521

Gas Corp., Forest Gas Corp., Doe, Inc. 1 through 10, and John and/or Jane Does 1 through 10 for

fraud, breach of contract, and conversion under New York State law and for related claims under

the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962© & (d) on April 21, 2010.

On December 13, 2010, Plaintiff filed an amended complaint against all original defendants and added the following additional defendants: Maira Rishty, Shlomo Arje a/k/a Michael Arje ("Arje"), National Gasoline Wholesale, LLC ("National Wholesale"), 971 Gas Corp., Sun Fuel Corp., 2509 Gas Corp., Irivington Oil Corp., Flatbush Oil Corp., Leahs Equities, Inc., Wrightstown Gas Corp., Caton Gas Corp., Superior Gas, Inc., and 31st Gas Corp. In the defendants' answer National Gasoline counterclaimed for breach of contract and Rishty counterclaimed for defamation.

Plaintiff then moved for summary judgment on all of its claims and the two counterclaims. On February 26, 2013, the Court issued a written opinion granting Plaintiff summary judgment on its conversion and breach of contracts claims, as well as on the remaining counterclaim. (Dkt. No. 127 ("Summ. J. Op.") at 16.) The Court found National Gasoline liable for breach of contract, Lax liable for breach of his personal guaranty, and Rishty, Lax, Arje, and Maira Rishty liable for conversion. (*Id.*)

The Court held a three-day bench trial from October 15-17, 2012, to determine the amount of damages for the breach of contract and conversion claims, and whether, or to what extent, liability on the conversion counts is joint and several. Six witnesses testified, Wells Fargo Senior Vice President Mark Long ("Long"), Wells Fargo Senior Vice President Robert Ostrowe ("Ostrowe"), Rishty, Maira Rishty, Arje, and Lax. In general, the Court finds Long and Ostrowe's testimony to be credible, while Arje, Rishty, Lax, and Maira Rishty were not credible,

especially in light of substantial documentary evidence contradicting their testimony.  The Court makes the following findings of fact and conclusions of law.  *See* FED. R. CIV. P. 52(a)(1).

## FINDINGS OF FACT

### I.    The Credit and Security Agreement and Note

On August 27, 2009, Plaintiff and National Gasoline entered into a Credit and Security Agreement (the "Credit Agreement") and revolving note (the "Note") establishing a $6,500,000 revolving line of credit (the "Loan").  (Exh. 1 ("Credit Agreement"); Exh. 7.)  Lax signed the Credit Agreement and the Note on behalf of National Gasoline.  (Oct. 15 Tr.[1] 115:2-3; Credit Agreement at 27; Exh. 7.)  The Note included National Gasoline's promise to make certain payments to Plaintiff and to perform various other obligations.  (Exh. 7.)  Lax also signed a personal guaranty (the "Guaranty") promising to pay all of National Gasoline's outstanding obligations.  (Oct. 15 Tr. 23:16-20; Exh. 9 ("Guaranty").)

Under the Credit Agreement, National Gasoline granted Plaintiff a security interest in certain "Collateral" to secure the performance of its obligations.  (Credit Agreement § 2.1.) Section 1.6(a) of the Credit Agreement provides that all proceeds of accounts and other Collateral should be deposited in the "Collection Account" each business day upon receipt or collection.  (Credit Agreement §1.6(a).)  Section 1.6(b) of the Credit Agreement also provides that, until deposited, National Gasoline shall hold all such payments and proceeds in trust for Plaintiff without commingling them with other funds or property.  (*Id.*)  The Collection Account

---

[1]  "Tr." refers to the trial transcript, and the accompanying calendar date indicates the specific day of trial.

is National Gasoline's HSBC Bank USA, N.A. ("HSBC") Account No. XXX-XX814-9. (Oct. 16 Tr. 206:3-25; 239:2-24).[2]

Additionally, any accounts owned by affiliates of National Gasoline are not "Eligible Accounts" and could not be used to calculate the borrowing base for the Loan. (Oct. 15 Tr. 19:2-20:2; Credit Agreement at A-3, A-4). An "Affiliate" is defined as "any Person controlled by, controlling or under common control with Company, including without limitation any Subsidiary of Company." (*Id.*) The Credit Agreement defines "Control," as "the power to direct the management and policies, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise." (Credit Agreement at A-1).

## II.    Relationships Among the Defendants and the Affiliated Entities

National Gasoline is a wholesale gas distributor owned and operated by individual defendants Arje, Lax, Rishty, and Maira Rishty. (Exhs. 1, 29, 44, 71-73, 88.) Michael Arje is the brother of Maira Rishty (formerly Maira T. Arje). (Oct. 17 Tr. 259:23-24.) Rishty and Maira Rishty are husband and wife. (Oct. 17 Tr. 255:4-5). Rishty and Maira Rishty had only one joint bank account for personal use. (Oct. 17 Tr. 264:3-17.) Defendants Arje,[3] Lax,[4] Rishty,[5] and

---

[2] The parties dispute whether Plaintiff established a valid "Collection Account," and so the term will be used only for descriptive purposes to indicate HSBC Account No. XXX-XX814-9.

[3] Arje was, at all relevant times, an owner, officer, director, managing member and/or authorized signatory of the following entities: 100 Rockaway Gas Corp. (Exh. 20 at 35; Exhs. 30 45, 58); 111th St Gas Corp. (Exh. 20 at 34:6-10; Exhs. 31, 46, 59); 2061 Gas Corp. (Exhs. 20 at 36:2-37:2; 32, 47, 60); 2509 Gas Corp. (Exh. 48); 86 Gas Corp. (Exh. 20 at 33:9-16; Exhs. 35, 49); Baisley Gas Corp. (Exh. 20 at 33:17-21; Exhs. 36, 50); Cooper Gas Corp. (Exh. 20 at 35:10-25; Exhs. 37, 51, 62); Flatbush Oil Corp. (Exh. 20 at 30:7-31:3; Exh. 63); Forest Gas Corp. (Exh. 20 at 37:15-38:2; Exhs. 39, 64); Irvington Oil Corp. (Exh. 20 at 38:15-39:5; Exh. 52); Leahs Equities (Exh. 20 at 31:4-32:6; Exhs. 53, 66); Melrose Gas Corp. (Exh. 20 at 33:22-34:5; Exhs. 40, 54); National Gasoline Wholesale, LLC. (Exh. 20 at 156-58; Exh. 41); Neptune Oil Corp.

4

Maira Rishty[6] (the "Conversion Defendants") own or control numerous retail gas stations and other businesses (the "Affiliated Entities").

As owners or officers of the Affiliated Entities, the Conversion Defendants were authorized signatories for these entities and also drew salaries or other compensation. The Conversion Defendants all received compensation from National Gasoline. (Exhs. 6, 25-26.) Between August 2009 and April 2010, Rishty, Maira Rishty, and Arje each regularly received checks from Affiliated Entities. (Exh. 27.) In particular, Rishty received weekly payroll checks from 86 Gas Corp, 2061 Gas Corp., Baisley Gas Corp., Melrose Gas Corp., and Neptune Oil Corp. between August 2009 and December 7, 2009. (Exh. 27.) Rishty and Maira Rishty agreed to redirect these payroll checks to Maira Rishty in December 2009 after discussing problems with Plaintiff stemming from his ownership of undisclosed Affiliated Entities. (Oct. 16 Tr. 229:8-20).

---

(Exh. 20 at 34:16-35:3; Exhs. 42, 55, 67); Sun Fuel Corp. (Exh. 20 at 38:8-39:5; Exh. 56); and Wrightstown Gas Corp. (Exh. 20 at 32; Exh. 68).

[4] Lax was, at all relevant times, an owner, officer, director, managing member and/or authorized signatory of the following entities: 971 Gas Corp. (Oct. 17 Tr. 330:15:18; Exh, 28); Caton Gas Corp. (Oct. 17 Tr. 330:19-20; Exh. 28); and Flatbush Oil Corp. (Oct. 17 Tr. 330:9-14; Exhs. 38, 63).

[5] Rishty was, at all relevant times, an owner, officer, director, managing member and/or authorized signatory of the following entities: National Gasoline Wholesale (Oct. 16 Tr. 207:7-13); 100 Rockaway Gas Corp. (Exhs. 45, 58); 111th St Gas Corp. (Exh. 46); 2061 Gas Corp. (Exh. 47); 31st Street Gas Corp. (Exh. 6 at 324-26); 86 Gas Corp. (Exhs. 35, 49); Baisley Gas Corp. (Exh. 50); Cooper Gas Corp. (Exhs. 37, 51); Forest Gas Corp. (Exh. 64); Irvington Oil Corp. (Exh. 6 at 247-48; Exhs. 52, 65); Leahs Equities (Exh. 21 at 131-32; Exhs. 53, 66); Melrose Gas Corp. (Exh. 54); Neptune Oil Corp. (Exhs. 55, 67); Ralph Avenue Gas and Store (Exh. 6 at 359-61); Sun Fuel Corp. (Exh. 56); and Wrightstown Gas Corp. (Exh. 21 at 150, 68).

[6] Maira Rishty was, at all relevant times, an owner, officer, director, managing member and/or authorized signatory of the following entities: 111th St Gas Corp. (Exh. 46); 2061 Gas Corp. (Exh. 47); 31st Gas Corp. (Exh. 33); 86 Gas Corp. (Exh. 49); Baisley Gas Corp. (Exh. 50); Cooper Gas Corp. (Exh. 51); and Leahs Equities (Exh. 53).

Maira Rishty began receiving weekly payroll checks from 86 Gas Corp, 2061 Gas Corp., Baisley Gas Corp., Melrose Gas Corp., and Neptune Oil Corp. on or around December 21, 2009 and continuing through April 2010.  (Exh. 27; Oct. 16 Tr. 229:8-20).

National Gasoline submitted Daily Collateral Reports and A/R Aging Detail Reports to Plaintiff as required by the Credit Agreement.  (Oct. 15 Tr. 61:1-22; Exhs. 10-12.)  Rishty was responsible for reporting this financial data.  (Oct. 15 Tr. 61:1-22).  The Daily Collateral Reports and A/R Aging Detail Reports listed as eligible accounts receivable due from the following entities: 100 Rockaway Gas Corp. a/k/a 100-07 Rockaway, Forest Gas Corp. a/k/a 1234 Forest, Flatbush Oil Corp. a/k/a 1267 Flatbush, Irvington Oil Corp. a/k/a 1399 Chestnut Ave. 2, 8521 Gas Corp. a/k/a 1611 Avenue Y2, Baisley Gas Corp. a/k/a 168-07 Baisley, Caton Gas Corp. a/k/a 1981 Ocean Ave., Sun Fuel Corp. a/k/a 2001 Neptune Ave., 2317 Ralph Ave. a/k/a Ralph Gas and Store, Inc., 2509 Gas Corp. a/k/a 2509 Victory Blvd., Neptune Oil Corp. a/k/a 292 Neptune Ave., 86 Gas Corp. a/k/a 2965 86th Street, Wrightstown Gas Corp. a/k/a 5004 Hwy. 33 & 34, Cooper Gas Corp. a/k/a 65-20 Cooper Ave., Melrose Gas Corp. a/k/a 871 2, 2061 Gas Corp. a/k/a 902 Westchester Ave. 2, 111th St. Gas Corp. a/k/a 94-02 111 St., 971 Gas Corp. a/k/a 971 Remsen, and Leahs Equities, Inc. a/k/a Bordentown.  (Exhs. 10-12.)

National Gasoline submitted requests for borrowing to Plaintiff throughout the course of the Credit Agreement based on eligible accounts receivable due to National Gasoline.  (Oct. 15 Tr. 57:17-58:1); (Exhs. 14, 15.)  Plaintiff advanced funds into National Gasoline's HSBC Account No. XXX-XX831-9 (the "Operating Account") based on the Daily Collateral Reports and A/R Aging Detail Reports.  (Oct. 15 Tr. 57:14-58:15; Exh. 4 ¶ 24; Exh. 16.)  National Gasoline then used the funds advanced by Plaintiff to purchase and supply gasoline to the

Affiliated Entities.  (Exh. 4 ¶¶ 24, 27; Exh. 16.)  National Gasoline was the sole supplier for each

of the Affiliated Entities for the two years before those stations closed.  (Exh. 20 at 89:11-15).

Rishty and other agents or employees of National Gasoline deposited checks into the

Collection Account in anticipation of collecting receivables from National Gasoline's customers,

before collecting the receivables.  (Exh. 6. at 382:6-383:20).  Rishty regularly received blank

checks from National Gasoline's customers, including gas stations owned by Arje, and then

drafted, signed and deposited the checks into National Gasoline's Collection Account. (*Id.* at

397:6-398:20).  Rishty wrote and signed checks on behalf of the Affiliated Entities, including the

following: 100 Rockaway Gas Corp., 111th St. Gas Corp., 2061 Gas Corp., 2509 Gas Corp., 31st

Gas Corp., 8521 Gas Corp., 86 Gas Corp., 971 Gas Corp., Baisley Gas Corp., Caton Gas Corp.,

Cooper Gas Corp., Forest Avenue Gas Corp., Irvington Oil Corp., Leahs Equities, Melrose Gas

Corp., Neptune Oil Corp., Ralph Avenue Gas and Store, Sun Fuel Corp., and Wrightstown Gas

Corp. (Exh. 6 at 122:20-123:8, 125:25-126:13, 150:17-23, 155:1-7; Exh. 70.)

## III. <u>Conversions and National's Default Under the Credit Agreement</u>

The Conversion Defendants were required to deposit all accounts receivable into the

Collection Account.  (Oct. 15 Tr. 16:2-15, 17:3-11; Oct. 16 Tr. 210:19-211:3; Oct. 17 Tr.

332:17-333:2; Exh. 6 at 378:18-22, 379:21-380:7; Credit Agreement §1.6(a)).  However, they

took cash collections from customers, including the Affiliated Entities, and deposited them into

accounts other than the Collection Account, including National Gasoline's HSBC Account No.

XXX-XX887-4 and 31st Street Gas Corp. HSBC Account No. XXX-XX650-2.  (Exhs. 18, 19;

Exh. 6. at 163:4-165:16, 329:20-330:25; Exh. 20 70:5-71:24, 76:8-18, 115:4-121:21; Exh. 21.

170:19-172:22).  This failure to hold Collateral in trust for Plaintiff, including accounts

receivable owed to National Gasoline, was an event of default under the Credit Agreement. (Credit Agreement § 6.1).

Chaim Lax and/or David Rishty transferred funds (the "2009 Converted Funds") from the Collection Account into National Gasoline Account No. 681-90887-4 between August 30, 2009 and December 8, 2009. (Exh. 18.) The following entities thereafter received transfers of the 2009 Converted Funds: $1,524,000 to the Operating Account; $1,427,265.13 to U.S. Management Firm; $21,000 to Mustang Bulk Carriers, Inc.; $20,000 to 31st Gas Corp.; and $840 to 971 Gas Corp. (Exhs. 18, 86.)

On April 13, 2010, Plaintiff formally notified National Gasoline of its default under the Credit Agreement. (Exh. 23.) Six days later, Plaintiff accelerated amounts due under the Credit Agreement. (Exh. 24.) National Gasoline stopped transferring funds from the Collection Account to Plaintiff after Plaintiff notified National Gasoline of its defaults under the Credit Agreement. (Oct. 16 Tr. 241:7-10).

Between April 13, 2010 and July 6, 2012, Chaim Lax and/or David Rishty transferred $13,624,574.77 (the "2010 Converted Funds") from the Collection Account directly to accounts owned by persons other than Plaintiff. (Exh. 4 ¶¶ 28-29; Exh. 7.) The 2010 Converted Funds were transferred to bank accounts owned by the following entities: $28,000 to 1267 Flatbush, LLC; $55,000 to 31st Gas Corp.; $15,000 to 971 Gas Corp.; $19,000 to Caton Gas Corp.; $650,000 to Global Companies, a fuel distributor; $41,866.41 to Leahs Equities; $50,000 to Mustang Bulk Carriers, a fuel transport company owned by Rishty and Arje; $9,512,075 to National Gasoline accounts other than the Collection Account; $3,070,633.36 to National

Gasoline Wholesale, LLC; $125,000 to Petrofox, a fuel distributor; and $58,000 to unknown accounts. (Exh. 4. ¶¶ 28-29; Exh. 87.)

At the same time, Arje, Rishty and Lax began operating National Wholesale to continue selling gas to National Gasoline's customers after the Credit Agreement default. (Oct. 16 Tr. 207:7-14). National Wholesale purchased gasoline from National Gasoline on or after April 16, 2010. (Oct. 17 Tr. 284:1-4) On April 16, 2010, Arje opened three HSBC accounts (Account Nos. XXX-XX366-5, XXX-XX367-3 and XXX-XX639-6) in National Wholesale's name. (Exh. 41.) Arje opened two additional HSBC accounts (Account Nos. XXX-XX370-3 and XXX-XX384-3) in National Gasoline Wholesale's name on June 16, 2010. (*Id*.) As a customer of National Gasoline, National Wholesale had no legitimate reason to receive transfers of funds from National Gasoline, Inc. (Oct. 17 Tr. 287:3-6.)

The Conversion Defendants have not returned any of the converted funds. (Exh. 4 ¶ 54).

## CONCLUSIONS OF LAW

### I.    Concerted Action Liability for Conversion

Concerted action liability is one of several collective liability theories recognized under New York law. *See, e.g.*, *Finn v. Morgan*, 362 N.Y.S.2d 292 (1974) (concerted action liability); *Hymowitz v. Eli Lilly & Co.*, 539 N.E.2d 1069, *cert. denied*, 493 U.S. 944 (1989) (market share liability); *Hall v. E.I. Du Pont De Nemours & Co.*, 345 F.Supp. 353 (E.D.N.Y. 1972) (enterprise, or industry-wide liability). A "concert of action theory" allows a defendant to be held joint and severally liable if he or she "commits a tortious act in concert with another or pursuant to a common design." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 633 (S.D.N.Y. 2001) (citations omitted).

"The paradigmatic case is a drag race where one driver is the cause-in-fact of plaintiff's injury but the other racer is also liable for the injury because their joint misbehavior contributed to the accident." *In re MTBE Prods. Liab. Litig.*, 175 F. Supp. 2d at 632; *see also Fuscaldo v. Jaiman*, No. 12295/04, 2006 WL 1882412, at *1 (N.Y. Sup. July 7, 2006) (street racing on residential boulevard); *De Carvalho v. Brunner*, 119 N.E. 563, 563 (N.Y. 1918) (horse racing on city street). But this theory is not limited to the street race context. *See e.g. D'Elia v. 58-35 Utopia Parkway Corp.*, 843 N.Y.S.2d 339, 341 (App. Div. 2007) (agreement to make false criminal complaint); *Harris v. Stanley*, 799 N.Y.S.2d 837 (App. Div. 2005) (agreement to throw water balloons in traffic); *Weldon v. Rivera*, 754 N.Y.S.2d 698 (App. Div. 2003) (agreement to commit sexual assault).

The elements of concerted action liability are as follows: (1) an express or tacit agreement to participate in a common plan or design to commit a tortious act, (2) tortious conduct by each defendant, and (3) the commission by one of the defendants, in pursuance of the agreement, of an act that constitutes a tort. *@Wireless Enterps., Inc. v. AI Consulting LLC*, 05-CV-6176 (CJS), 2006 WL 3370696, at *8 (N.D.N.Y. Oct. 30, 2006) (quoting *Pittman by Pittman v. Gray son*, 149 F.3d 111, 122-23 (2d Cir. 1998)); *See also Rastelli v. Goodyear Tire & Rubber Co.*, 591 N.E.2d 222 (N.Y. 1992). Under any theory of concerted action liability, "the defendant must know the wrongful nature of the primary actor's conduct." *Pittman*, 149 F.3d at 122 (2d Cir. 1998) (citations omitted). "It is essential that each defendant charged with acting in concert have acted tortiously, and that one of the defendants commited an act in pursuance of the agreement which constitutes a tort." *Rastelli*, 591 N.E.2d at 224 (citing PROSSER & KEETON, TORTS § 46, at

323 (5th ed); *see also Perry v. City of New York*, 566 N.Y.S.2d 263, 263 (App. Div. 1991) (finding "mere[] observers" are not liable for the injuries).

As an initial matter, in its summary judgment opinion, the Court held that each of the Conversion Defendants both engaged in tortious conduct in satisfaction of element two and also committed a tortious act in pursuance of the common plan in satisfaction of the third element. (Summ. J. Op. at 16.) Thus, to hold the Conversion Defendants jointly and severally liable, Plaintiff must only prove that each of these defendants expressly or tacitly agreed to "participate in a common plan or design to commit a tortious act." *Rastelli*, 591 N.E.2d at 224.

"[A] defendant who understands the general objectives of the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly to do its part to further those objectives . . . is liable as a conspirator." *In re MTBE Prods. Liab. Litig.*, 175 F. Supp. 2d 593, 634 (S.D.N.Y. 2001); *see also Sackman v. Liggett Group, Inc.* 965 F.Supp. 391, 396 (E.D.N.Y. 1997); *Policastro v. Savarese*, 567 N.Y.S.2d 784, 787 (N.Y. App. Div. 1991) ("the evidence must show that [Defendants] agreed, either expressly or impliedly, to engage in a particular course of conduct."). Specifically, Plaintiff must prove that "[the defendants] acted in concert in furtherance of a common plan" by a preponderance of evidence. *D'Elia*, 843 N.Y.S.2d at 341. "Circumstantial evidence may permit a factfinder to infer that a witness had knowledge of a particular fact despite his testimonial denial of knowledge." *In re Dana Corp.*, 574, F.3d 129, 153 (2d Cir. 2009) (citations omitted).

However, evidence of mere parallel activity among defendants "is insufficient to establish the agreement element necessary to maintain a concerted action claim" *Rastelli*, 591 N.E.2d at 224; *see also Blakeslee v. Wadsworth*, 831 N.Y.S.2d 556, 558-59 (App. Div. 2007) (finding no

"explicit or implicit agreement" between the defendants to engage in a "high speed passing game"); *Canavan v. Galuski*, 769 N.Y.S.2d 629, 632 (App. Div. 2003); *DaSilva v. American Tobacco Co.,* 667 N.Y.S.2d 653, 657 (Sup. Ct. 1997).

Here, Plaintiff has offered sufficient evidence to prove that the Conversion Defendants, a small group of family members and their business associate, agreed to engage in a complex scheme to convert Plaintiff's property by way of funds transfers through and among accounts belonging to National Gasoline and the Affiliated Entities. In order to execute their plan, the Conversion Defendants incorporated and opened bank accounts for the Affiliated Entities, naming themselves as authorized signatories for these accounts. (Exhs. 26-69.) These entities were then treated as one, along with National Gasoline, to convert accounts receivable owed Plaintiff under the Credit Agreement.

As part of this scheme, the Conversion Defendants hid their ownership of most of the Affiliated Entities, and then submitted borrowing requests to Plaintiff based on these ineligible accounts. (Exhs. 10-13, 18; Oct. 15 Tr. 57:16-58:15, 66:13-25.) This allowed the Conversion Defendants to artificially inflate National Gasoline's borrowing base. After Plaintiff questioned the eligibility of certain Affiliated Entities, the Conversion Defendants transferred ownership of certain entities in order to continue their deception. (Exhs. 79-80.) All the while, the Conversion Defendants diverted Plaintiff's property, accounts receivable to be held in trust, from the Collection Account to accounts beyond Plaintiff's control. (Exhs. 16-19, 86-87.)

Despite the weight of the documentary evidence, the Conversion Defendants testified that there was no plan to convert Plaintiff's property. For instance, Maira Rishty testified that "the only thing [she's] president of is [her] house" and that she had no knowledge of the Credit

Agreement or any scheme. (Oct. 17 Tr. 257:3-24.) However, Maria Rishty's numerous corporate affiliations, her receipt of checks from the Affiliated Entities, and her signature on a 2009 tax return all indicate that it is more likely than not that she knew of the scheme and intended to profit from the conversions. (Oct. 17 Tr. 261:15-262:7 Exhs. 33, 46, 47, 49, 51, 53.) What is more, at no point during her testimony did Maira Rishty offer a plausible explanation as to why her name or her signature appeared on these documents.

Maira Rishty was also the sole person authorized to use the account for 31st Gas Corp., the account Rishty testified was used as a clearinghouse account for the Affiliated Entities. (Oct. 15 Tr. 42:23-24; Exh. 6 163:6-164:20; Exhs. 18, 33.) Maira Rishty did not deny being an authorized signatory for 31st Gas Corp. at trial, she was, at most, ambivalent about her role with this entity. (Oct. 17 Tr. 265:2-8.) In addition, Rishty testified at his deposition that Maria Rishty, on occasion, made phone calls or conducted inventory for National Gasoline and the Affiliated Entities. (Oct. 16 Tr. 235:1-17.) Finally, Rishty also testified he and Maira Rishty discussed "the problems we had [with] Wells Fargo." (Oct. 16 Tr. 229:8-20.) At bottom, there is ample to prove that Maira Rishty was aware of the plan to defraud Plaintiff, and that she participated in it. Her self-serving testimony to the contrary is simply unbelievable.

Similarly, Arje's testimony that he was a merely a businessman and not an owner or officer of National Gasoline or the Affiliated Entities is also contradicted by weight of the documentary evidence. Arje claims he signed blank papers without understanding the significance of these acts, papers he testified were later filled out by a third party to identify Arje as a corporate officer of the various entities. (Oct. 17 Tr. 296:8-297:25.) The Court finds this explanation implausible. Not only is Arje's testimony inconsistent with the signed documents,

13

but both his body language while on the witness stand and his manner of answering questions on cross-examination indicated untruthfulness.  (*See, e.g.*, Exh. 44.)  In particular, Arje shifted in his seat, spoke very quickly and evasively, and responded to certain questions in a combative manner.  *See GAMCO Invs., Inc. v. Vivendi, S.A.*, Nos. 03-CV-5911 (SAS), 09-CV-7962 (SAS). 2013 WL 765122, at *3 (S.D.N.Y. Feb. 28, 2013) ("[The witness] appeared ill at ease with answering direct questions candidly, as if he took his oath subject to the reservation that he be permitted to define 'the truth.'"); *see also Gucci Am., Inc. v. Guess?, Inc.*, 868 F.Supp.2d 207, 226 (S.D.N.Y. 2012).   Thus, after comparing Arje's testimony with the signed documents in evidence, the Court finds that Arje was also not a credible witness.  *Diesel Props S.r.l. v. Greystone Business Credit II LLC*,  631 F.3d 42, 52 (2d Cir.  2011) ("In deciding whether factual findings are clearly erroneous, we are required to 'give due regard to the trial court's opportunity to judge the witnesses' credibility.'") (quoting FED. R. CIV. P. 52(a)(6));  *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)).

Likewise, Rishty's contentions that "he had no intent[ion] to cheat Wells Fargo" and that "he believe[d] he was doing the right thing" by transferring funds between the accounts are also not credible in light of the documentary evidence.  (Dkt. No. 117 at 6.)  His testimony is contradicted by the voluminous records of funds transfers from National Gasoline's HSBC accounts including checks signed by Rishty himself, the account application documents for multiple Affiliated Entities bearing his name, the removal of his ownership stake in these entities in December 2009, and the transfer of his National Gasoline paychecks to Maira Rishty.  (Exhs. 16-19, 26-69, 79-80, 86-87.)

Finally, Lax also cannot claim that he did not act in concert with the other Conversion Defendants. Lax seeks to avoid liability by arguing that he did not personally convert any funds, nor did he act in concert with the Conversion Defendants. (Dkt. No. 121 at 2-4, 5-8.) In support of this argument, Lax notes that he disclosed his ownership interests to Plaintiff, did not benefit from the converted funds received by entities he owned, and did not convert cash received from customers. Lax also argues that he held no ownership stake in National Gasoline Wholesale. (*Id*. at 3-4.)

While Lax is correct that the evidence at trial is insufficient to prove he converted the March 29, 2010 cash deposits, his other arguments fail to relieve him of liability for the scheme. First, his disclosure of ownership interests does not disprove his involvement. Lax was the personal guarantor of the Credit Agreement, was required to accurately list his assets in order to secure the Loan, and his personal holdings likely faced the most scrutiny. Had Lax deceived Plaintiff about his ownership interests, the Loan would have been denied and the scheme would have failed at the outset. And in spite of his disclosures, the Conversion Defendants nevertheless transferred Collateral to entities Lax owned. (Exhs. 16-19, 86-87.) Second, it is irrelevant that Lax claims he did not "benefit" from the conversions, the fact remains that converted funds were transferred to entities under his control and he did not return these funds. (Exhs. 86-87.) Third, the Court does not find it credible that Lax, notwithstanding any language barriers, was unaware of the purpose of the funds transfers from National Gasoline and that he signed a series of checks without further inquiry. (Oct. 17 Tr. 331:19-25) Fourth, and finally, it is not necessary for the Court to find that Lax held an ownership stake in National Gasoline Wholesale to find him jointly liable as a participant in the larger scheme.

Accordingly, the Court finds that Plaintiff has shown, by a preponderance of the evidence, that the Conversion Defendants all agreed to participate in the scheme to convert Plaintiff's property, and as such they are each jointly and severally liable for the entire amount of the conversion. The Court can reasonably infer from the documentary evidence, most notably bank records, that the Conversion Defendants agreed to incorporate and open accounts for the Affiliated Entities and then treat these entities as one to gain possession of Plaintiff's property. Moreover, the sheer volume of carefully synchronized account applications and funds transfers indicate that the Conversion Defendants' actions amounted to more than parallel activity. In coming to this conclusion, the Court also finds that any testimony from the Conversion Defendants to the contrary is not credible in light of the documentary evidence, the individuals' motives to testify falsely, and the tone and demeanor of certain witnesses during trial.

## II. Damages for Breach of Contract and Conversion

### A. Breach of Contract

Under New York law the measure of damages for a breach of contract is an amount sufficient to place the non-breaching party "in as good a position as he would have been put by full performance of the contract." *Terwilliger v. Terwilliger*, 206 F.3d 240, 247 (2d Cir. 2000) (quoting *Freund v. Wash. Square Press, Inc.*, 357 N.Y.S.2d 857 (1974)). "But it is equally fundamental that the injured party should not recover more from the breach than he would have gained had the contract been fully performed." *Freund*, 357 N.Y.S.2d at 857 (citations and quotations omitted).

Here, Plaintiff submits that National Gasoline's outstanding obligations under the Credit Agreement total $6,575,681.39 as of October 1, 2012. (Oct. 15 Tr. 26:23-27:5; Exh. 92.) After

subtracting attorneys' fees and costs, discussed *infra*, the outstanding loan balance, including interest and fees, is $5,339,020.18. National Gasoline is required to repay this amount under the Credit Agreement due to its breach of contract. Lax, in turn, is also required to pay this amount under the Guaranty.

Additionally, a plaintiff who prevails on a breach of contract claim is entitled to prejudgment interest as a matter of right. *See Scavenger, Inc. v. GT Interactive Software Corp.*, 734 N.Y.S.2d 141, 142 (App. Div. 2001) (citing *U.S. Naval Inst. v. Charter Comm., Inc.*, 936 F.2d 692, 698 (2d Cir. 1991)). "In New York, the statutory rate for prejudgment interest in a breach of contract action is 9% per annum." *Id.* (citing C.P.L.R. § 5004). "Interest shall be recovered upon a sum awarded because of a breach of performance of a contract . . . [and] interest shall be computed from the earliest ascertainable date the cause of action existed . . . ." C.P.L.R. § 5001(a)-(b). "When 'damages were incurred at various times,' interest shall be 'computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.'" *Chaman Lal Settia Exps., Ltd. v. Sawhney*, No. 00-CV-2838 (MBM), 2003 WL 21649652, at *4 (S.D.N.Y. May 28, 2003) (citing C.P.L.R. § 5001(b)). Courts are afforded broad discretion in fashioning a reasonable intermediate date from which to calculate prejudgment interest. *Conway v. Icahn & Co., Inc.*, 16 F.3d 504, 512 (2d Cir. 1994).

Here, Plaintiffs damages – caused by National's failure to hold the accounts receivable in trust – were incurred at various times throughout the duration of the Credit and Security Agreement. (Summ. J. Op. at 14; Exhs. 86-87.) The first such violation of the Credit Agreement, a transfer of funds to U.S. Management Firm, occurred on September 9, 2009 and the damages continued to be incurred through the date Plaintiff accelerated the amount due, April

19, 2010. (Exhs. 86-87.) Accordingly the Court finds a reasonable intermediate date for computing prejudgment interest is December 29, 2009. Interest should run from that date and be awarded based on the following calculation: ($5,339,020.18 x 0.09)/365 = $1,316.47 per diem, calculated from December 29, 2009, through today, April 18, 2013, for a total of $1,587,663.70.

Thus, Plaintiff is entitled to $6,926,683.88, jointly and severally, from Lax and National for breach of the Credit Agreement and the Guaranty.

B.    Conversion

A plaintiff who prevails on a conversion claim "may recover the value of the property at the time and place of conversion, plus interest." *Edidin v. Uptown Gallery, Inc.*, 09-CV-7829 (DLC) (GWG), 2010 WL 2194817 at *1 (S.D.N.Y. June 1, 2010) (citing *Bank of New York v. Amoco Oil Co.*, 35 F.3d 643, 657, 659, 662 (2d Cir.1994) and *Fantis Foods, Inc. v. Standard Importing Co.*, 425 N.Y.S.2d 783, 786 (1980)). Here, the value of the property converted exceeds the outstanding balance of the Loan, and so Plaintiff caps the recovery sought for the conversions by this figure. (Exh. 92.) Plaintiff is therefore entitled to $5,339,020.18, the outstanding loan balance, from the Conversion Defendants. And as with the breach of contract claim, Plaintiff is also entitled to 9% prejudgment interest on its conversion claims. *See Outram v. Outram*, No. 08-CV-3437 (ADS) (ETB), 2010 WL 1222935, at *2 (E.D.N.Y. Mar. 4, 2010). The first conversion occurred on September 9, 2009, and the conversions continued through August 6, 2010. Accordingly, the Court finds a reasonable intermediate date for computing prejudgment interest is February 6, 2010. Interest should run from that date and be awarded based on the following calculation:($5,339,020.18 x 0.09)/365 = $1,316.47 per diem, calculated from February 6, 2010, through today, April 18, 2013, for a total of $1,536,321.34.

18

Thus, Plaintiff is entitled to $6,875,341.52, jointly and severally, from the Conversion Defendants for their conversions.

C.     Attorneys' Fees

Under New York law, which follows the "American Rule," attorneys' fees are not ordinarily a recoverable element of damages, "in the absence of a statute or enforceable contract providing therefor." *Singer v. Xipto Inc.*, 10-CV-8501, 2012 WL 1071274, at * 8 (S.D.N.Y. Mar. 30, 2012) (quoting *Summit Valley Indus., Inc. v. Local 112 United Bhd. of Carpenters & Joiners*, 456 U.S. 717, 721 (1982)).  Courts should not infer a party's intention to provide fees as damages because attorneys' fees provisions "run against the grain of the accepted policy that parties are responsible for their own attorneys' fees," *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 177 (2d Cir. 2005) (citing *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199 (2d Cir. 2003)).  But, "[u]nder New York law, a contract that provides for an award of reasonable attorneys' fees to the prevailing party in an action to enforce the contract is enforceable if the contractual language is sufficiently clear." *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008).  Accordingly, a clause providing for attorneys' fees must be narrowly interpreted. *Id*. at 178; *Gottlieb v. Such*, 740 N.Y.S.2d 44, 45 (App. Div. 2002).

Here, the "Costs and Fees" section of the Credit Agreement specifically provides that Plaintiff is entitled to "all costs and expenses, including . . . reasonable attorneys' fees incurred by [Plaintiff] in connection with the Indebtedness . . . including without limitation all such costs, expenses and fees incurred in connection with the . . . *collection and enforcement of the Indebtedness and the creation, perfection, protection, satisfaction, foreclosure or enforcement of*

19

*the Security Interest*." (Credit Agreement § 7.7 (emphasis added).) A similar provision in the Guaranty indicates that Lax is required to pay Plaintiff "the full amount of all . . . costs and expenses, including reasonable attorneys' fees . . . in connection with the *enforcement of any of [Plaintiff's] rights, powers or remedies . . .* and/or the *collection of any amounts which become due to [Plaintiff] under this Guaranty . . . .*" (Guaranty §10 (emphasis added).) Thus, Plaintiff is entitled to reasonable attorneys' fees and costs from National Gasoline and Lax under the Credit Agreement and the Guaranty, including collection costs and fees. Plaintiff is not, however, entitled to attorneys' fees and costs from Rishty, Maira Rishty, and Arje as they are not signatories to either contract.

As the moving party, the plaintiff bears the burden of "establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Savoie v. Merchs. Bank*, 166 F.3d 456, 463 (2d Cir. 1990) (internal citation and quotation marks omitted). The plaintiff must provide contemporaneous time records that should "specify, for each attorney, the date, the hours expended, and the nature of the work done." *Thomas v. United States*, 02-CV-5746 (HBP), 2011 WL 6057898, at *6 (S.D.N.Y. Dec. 5, 2011) (quoting *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983)).

Plaintiff seeks an award of fees for each of the three firms that have represented it in this case: (a) $964,476 for Leitess Friedberg PC ("LFPC"); (b) $195,974.91 for Strassberg & Strassberg, P.C. ("Strassberg"); and (c) $7,667.80 for Benowich Law, LLP ("Benowich"). (Dkt. No. 122 ("Friedberg Fee Aff.") at 6, 8, 9.) As an initial matter, it is not appropriate to award Benowich attorneys' fees in this case, because its attorneys only performed legal work in *Wells Fargo Bank, N.A. v. HSBC Bank, N.A.*, No. 10-CV-5140 (RRM) (ALC) (the "HSBC Action").

(Friedberg Fee Aff. at 8-9.)  The Court, reading the fees provisions of the Credit Agreement and Guaranty narrowly, determines that these provisions do not clearly indicate that a suit against HSBC for an alleged breach of the control agreement for the Collections Account is a "collection and enforcement of the Indebtedness [or] enforcement of the Security Interest."  (Credit Agreement, § 7.7; *see also* Guaranty § 10.)  Thus, the Court will only address the reasonableness of fees for work performed by LFPC and Strassberg.

## I.     Reasonable Hourly Rates

The Second Circuit has instructed district courts to evaluate the reasonableness of an attorneys' fee award under the "presumptively reasonable fee" standard, which is equal to a reasonable hourly rate multiplied by a reasonable number of hours expended.  *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany,* 522 F.3d 182, 190 (2d Cir. 2008).  The reasonable hourly rate is "the rate a paying client would be willing to pay," bearing in mind "that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively."  *Id.*  District courts have considerable discretion in determining the reasonable rate, but should "bear in mind *all* of the case-specific variables that . . . have [been] identified as relevant to the reasonableness of attorneys' fees," including the level of skill required to perform the legal service properly, the attorney's customary hourly rate, the amount involved in the case, and the experience, reputation, and ability of the attorneys.  *Id.* at 186 n.3, 190 (internal citations omitted).

The general range of rates received by attorneys in this district spans from $200 to $400 for partners, $200 to $250 for senior associates, $100 to $150 for junior associates, and $70 to $80 for legal assistants.  *See Opulen Ventures, Inc. v. Axcessa,* LLC, No. 12-CV-1776 (RRM)

(RER), 2012 WL 829230, at *4 (E.D.N.Y. Jan. 22, 2013); *Bd. of Trs. of the Ins. v. Liberty Signs, Inc.,* 10-CV-1737 (ADS) (AKT), 2011 WL 4374519, at *5 (E.D.N.Y. Aug. 30, 2011) (collecting cases); *Vazquez v. Ranieri Cheese Corp.*, No. 07-CV-0464 (ENV) (VVP), 2011 WL 554695, at *2 (E.D.N.Y. Feb. 7, 2011) (citing *Luca v. Cnty. of Nassau,* 698 F.Supp. 2d 296, 305-06 (E.D.N.Y. 2010)); *see also Santiago v. Coco Nail HB, Inc.,* No. 10-CV-3373 (ILG) (MDG), 2012 WL 1117961, at *3 (E.D.N.Y. Mar. 16, 2011) (collecting cases) (finding the prevailing hourly rates for partners in this district between $300 and $400).

For LFPC's services, Plaintiff seeks hourly rates for attorneys with more than twenty-years experience ranging from $355 to $395; for attorneys with more than ten-years experience ranging from $250 to 275; for attorneys with four-years experience ranging from $185 to 195; for attorneys with one year of experience $195; and for non-attorney support staff ranging from $135 to $140.  (Dkt. No. 123 ("Friedberg Decl.") ¶ 10.)  The Court finds the rates charged for attorneys reasonable with the exception of the hourly rate for attorneys with one year of experience. Accordingly, it must reduce the hourly rate for attorneys with one year of experience to $150 in keeping with the general range of rates in the district.  Similarly, the Court must also reduce the hourly rate for all non-attorney support staff to $75.

For Strassberg's services, Plaintiff seeks an hourly rate of $375 for 4/2010-8/2010, $400 for 8/2010-6/2011 and 12/2011-5/2012, and $440 for 10/2011-11/2011.  (Exh. 90.)  The Court finds it appropriate to reduce Strassberg's hourly rate for attorneys to $200 because Plaintiff supplies no information to justify the reasonableness of their rates.  Specifically, Plaintiff has not offered sufficient factual background about the experience or expertise of Strassberg's attorneys to merit hourly rates at the high end of the range for partners in this district.  In the absence of

such information a reduction is appropriate.  *See Garland v. Cohen & Krassner,* No. 08-CV-4626 (KAM) (RLM), 2011 WL 6010211, at *11 (E.D.N.Y. Nov. 29, 2011).

Accordingly, I will award fees to LFPC at a rate of $355 to $395 per hour for Jeremy S. Friedberg and Steven N. Leitess, who have each practiced law for twenty years or more, $250 to $275 per hour for Gordon S. Young, who has practiced law for thirteen years, $185 to $195 per hour for Joseph A. Pulver, who has practiced law for four years, $150 per hour for Pierce C. Murphy, who has practiced law for one year, and $75 per hour for non-lawyer assistants Dapo R. Lawal, Rosalee A. Johnson, and Shelley J. Baker.  In addition, I will award fees to Strassberg at a rate of $200 per hour for Robert Strassberg and Todd Strassberg.

ii.    Reduction of Hours

Plaintiff seeks fees for a total of 3,506.9 hours for work performed by LFPC and 109.2 hours for work performed by Strassberg.  When examining the hours billed, a court should determine reasonableness by considering "the value of the work product of the specific expenditures to the client's case."  *Trs. of the Rd. Carriers Local 707 Welfare Fund v. Goldberg,* 08-CV-0884 (RRM) (MDG), 2009 WL 3497493, at *9 (E.D.N.Y. Oct. 28, 2009) (internal citations omitted).  The Court must make "a conscientious and detailed inquiry into the validity of the representations that a certain number of hours were usefully and reasonably expended." *Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994).  The Court should exclude "excessive, redundant or otherwise unnecessary hours" from the fee award.  *Quaratino v. Tiffany & Co.,* 166 F.3d 422, 425 (2d Cir. 1999) (internal citations omitted).  "In lieu of making minute adjustments to individual timekeeping entries, a court may make across-the-board percentage cuts in the number of hours claimed, 'as a practical means of trimming the fat from a fee

application.'"  *Heng Chan v. Sung Yue Tung Corp.*, 03-CV-6048 (GEL), 2007 WL 1373118, at *

5 (S.D.N.Y. May 8, 2007) (quoting *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 237 (2d

Cir. 1987)).

After carefully reviewing the contemporaneous records that have been submitted, the

Court is limiting the award of attorneys' fees to only the those hours spent litigating this action

and not for the 1505.2 hours spent on the HSBC Action or *Wells Fargo Bank N.A. v. DDK &*

*Co., LLP*, No 11-cv-00008 (RRM) (RER) (the "DDK Action").  Plaintiff is entitled to the award

of reasonable attorneys' fees under the Credit Agreement and Guaranty, and after again narrowly

reading the relevant fees provisions, the Court determines that the HSBC and DDK Actions are

not the type of cases anticipated by those agreements.  Accordingly, after taking into account the

reduction of hours and the reduced hourly rates,  I award $511,275 to LFPC in attorneys' fees.

Similarly, after taking into account the reduced hourly rate for attorneys, I award $21,840 to

Strassberg in attorneys' fees.

D.     Costs

LFPC seeks costs in the amount of $28,382.71 for this case, including $4,867.56 in

private investigation, $1,320 in private process service, $712.01 in FedEx fees, $389 in filing

fees, $1,095 in UCC filings and searches, $2,332.87 in photocopies, $2,121.88 in transcripts, and

$3,351.83 for travel.  (Friedberg Decl. at 6-7.)  Strassberg seeks costs in the amount of

$24,101.64 spread throughout several invoices and riders.  (Exh. 90.)  An award of attorneys'

fees should "include those reasonable out-of-pocket expenses incurred by attorneys and

ordinarily charged to their clients."  *Cesario v. BNI Constr., Inc.*, No. 07-cv-8545 (LLS) (GWG),

2008 WL 5210209, at *10 (S.D.N.Y. Dec. 15, 2008) (quoting *LeBlanc-Sternberg v. Fletcher*,

143 F.3d 748, 763 (2d Cir. 1998)).  Courts have found that expenses reasonably charged to a client might include express mail, long distance telephone, local travel, messenger services, and copying.  *See King Vision Pay-Per-View Corp., Ltd. v. Tardes Calenas Moscoro, Inc.*, 01-CV-9775 (JGK) (JC), 2004 WL 473306, at * 5 (S.D.N.Y. Mar. 12, 2004); *Sulkowska v. City of New York*, 170 F. Supp. 2d 359, 370 (S.D.N.Y. 2001) (internal citation omitted).  I find the costs LFPC and Strassberg seek to be appropriate and will award them.  Accordingly I will award LFPC $23,696.41 in costs and Strassberg  $24,101.64 in costs.

E.      Post-Judgment Interest

Plaintiff is also entitled to post-judgment interest from the Conversion Defendants, Lax, and National Gasoline.  Pursuant to 28 U.S.C. § 1961, post-judgment interest is calculated from the date of entry of judgment at a rate equal to the weekly average one-year constant maturity Treasury yield.

## **CONCLUSION**

For the foregoing reasons, Plaintiff is awarded the following:

| Defendant | Claim(s) | Damages | Fees and Costs |
|---|---|---|---|
| National Gasoline | Breach of Contract | $6,926,683.88 (jointly and severally with Chaim Lax) | $580,913.05 (jointly and severally with Chaim Lax) |
| Chaim Lax | Breach of Contract; Conversion | $6,926,683.88 (jointly and severally with National Gasoline, and also with Shlomo Arje, David Rishty, and Maira Rishty for the Conversion) | $580,913.05 (jointly and severally with National Gasoline) |
| Shlomo Arje | Conversion | $6,875,341.52 (jointly and severally with Chaim Lax, David Rishty, and Maira Rishty) | None |
| David Rishty | Conversion | $6,875,341.52 (jointly and severally with Chaim Lax, Shlomo Arje, and Maira Rishty) | None |
| Maira Rishty | Conversion | $6,875,341.52 (jointly and severally with Chaim Lax, Shlomo Arje, and David Rishty) | None |

I also find Chaim Lax, Shlomo Arje, David Rishty, and Maira Rishty are jointly and severally liable to Wells Fargo for post-judgment interest on the conversion claim. Additionally, National Gasoline and Chaim Lax are jointly and severally liable to Wells Fargo for post-judgment interest on the breach of contract claim. The Clerk of the Court is respectfully directed to enter judgment in accordance with this Order.

**SO ORDERED.**

Dated: April 30, 2013
      Brooklyn, New York

*Ramon E. Reyes, Jr.*
                         **Ramon E. Reyes, Jr.**
                         **United States Magistrate Judge**